A10A2060. IN THE INTEREST OF J. G., a child.

(706 SE2d 741)

BARNES, Presiding Judge.

The mother of J. G. appeals the juvenile court's order finding J. G. deprived and giving legal custody to the Department of Family and Children Services ("DFCS"). The mother argues that the court erred in finding clear and convincing evidence that J. G., who was born September 20, 2003, was deprived, and erred in "taking custody of the minor child away from his mother." For the reasons that follow, we affirm.

On March 6, 2007, DFCS filed a petition alleging that J. G. was deprived because his mother was using cocaine, had a mental health issue that rendered her unable to care for J. G. properly if not treated, had not complied with recommended mental health treatments, and had failed to adequately supervise J. G. The department subsequently was granted temporary custody of J. G. After a shelter care hearing, the juvenile court found on March 13, 2007 that there was probable cause that J. G. was deprived and transferred custody to J. G.'s grandmother, directing her not to allow the mother to be with J. G. without supervision. Following an adjudicatory hearing, the juvenile court determined on April 25, 2007 that the mother was using cocaine, had failed to comply with her mental health care providers' recommendations, and had failed to adequately supervise J. G. The court directed DFCS to assist the mother in obtaining help for her substance abuse and mental health issues and continued temporary legal custody of J. G. with his grandmother, again with the

provision that she not allow the mother to have unsupervised contact with the child. The court also ordered the grandmother not to return custody of J. G. to anyone else without a written order of the court, and concluded that the order would expire on April 16, 2009.

The court held numerous hearings over the next two years in response to the mother's requests for review, the first of which she filed less than three months after the deprivation order. After three hearings, the juvenile court found on November 27, 2007 that the mother was not complying with the recommendation of her mental health care providers, that her mental health was unstable, and that her home environment was unsafe. The court ordered the mother to complete drug treatment, remain drug free at least six months, take her medication as prescribed, maintain a stable work history and home environment, and allow DFCS and the guardian ad litem access to her home.

Following another hearing at the mother's request, the juvenile court in May 2008 found that the mother had not completed her reunification plan and was not ready to regain custody of J. G. Her home was still "in a state of clutter and disarray" and contained dangerous items, she was "oblivious" to the beeping of a smoke alarm with a low battery, and she had not been taking her medication properly. The court denied the mother's request for the return of the child and ordered that "[a]ll future review hearing requests shall only be made by counsel." After a status hearing in June 2008, the court found on August 11, 2008 that the mother's home was still in disarray, the mother only having moved clothes and debris from the house to the side of the house. The court also found that the mother continued to exhibit erratic behavior, finding that "[d]espite being told not to contact the Court, she repeatedly telephones several times an hour, day after day, demanding that the Court schedule review hearings." In addition to completing the tasks described earlier, the court also directed the mother to submit to a hair follicle test and to an evaluation by a counselor, and to follow all recommendations.

Following a review hearing in March 2009, the juvenile court found that the mother had successfully completed several require-ments of her reunification plan, such as completing parenting classes and drug treatment, remaining drug free, and taking her medication. She was not financially stable, however, and continued to "exhibit erratic and unstable behavior," including calling the court constantly about this case despite instructions to go through her attorney and displaying "volatile behavior" at the review hearing. The child told the court he felt he needed to take care of his mother, whose behavior scared him, that he was afraid he would die if he went to live with her, and that she gets loud and hits, kicks, or squeezes him when she becomes angry. The mother admitted disciplining the child by hitting

him on his bottom or legs with her hand or a belt. The child was "extremely bonded with his grandmother," and feared for his safety when he visited his mother, even though he loves her. The guardian ad litem recommended J. G. remain in his grandmother's custody, and the court denied the mother's request for return of the child to her home, holding that keeping him with his grandmother was in his best interest.

In August 2009, the mother filed a complaint seeking custody of J. G. She noted that the previous order of adjudication and disposition expired by its terms in April 2009, and contended that she had completed all the requirements of her case plan. The court set a review hearing for September 16, 2009, and on that day the guardian ad litem filed a deprivation petition seeking to have legal custody placed with J. G.'s grandmother. The guardian contended that the mother's home was not safe, and that the mother had a serious mental health condition, exhibited erratic behavior which scared the child, disciplined the child inappropriately, and lacked the capacity to parent him properly. The parties waived a shelter care hearing, the mother dismissed her complaint seeking custody, and temporary legal custody was given to the grandmother. The juvenile court appointed an investigator and ordered the mother to cooperate and to obtain a psychological evaluation.

The court held hearings on December 10, 2009, December 15, 2009, and January 4, 2010, to address the allegations of the deprivation petition. In a detailed five-page order filed on February 3, 2010, the juvenile court determined that J. G. was deprived. After a disposition hearing on February 4, 2010, the court found that it was in J. G.'s best interest that DFCS design a plan to reunify the child with his mother and ordered the department to develop a case plan to be submitted to the court. Temporary custody was placed with DFCS.

The mother appeals the February 3, 2010 order finding J. G. to be deprived, arguing that the court erred in finding clear and convincing evidence he is a deprived child and erred in taking legal custody from the mother.

1. A "deprived child" is defined, among other things, as a child without the proper parental care or control necessary for the child's physical, mental, or emotional health. OCGA § 15-11-2 (8) (A). On appeal from a deprivation order, we view the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found clear and convincing evidence of deprivation. *In the Interest of A. B.*, 285 Ga. App. 288 (645 SE2d 716) (2007). We neither weigh evidence nor determine the credibility of witnesses. Id. In balancing the child's interests against the mother's parental rights, the juvenile court is

vested with broad discretion which will not be disturbed on appeal if the ruling is supported by clear and convincing evidence. *In the Interest of J. A.*, 286 Ga. App. 704, 704-705 (649 SE2d 882) (2007).

The mother argues that when the deprivation petition was filed in September 2009, J. G.'s grandmother had physical custody of him by virtue of the juvenile court's order of April 2007, even though the order had expired. All parties agreed that the grandmother had been caring for J. G. appropriately, and therefore, the mother argues, J. G. could not have been deprived at that time. Further, the mother argues, she visited the child daily and for years had maintained adequate, stable, safe housing for both of them. She had income sufficient to cover expenses, and she had completed all the classes and counseling she was asked to take. She had remained drug free for years, as proven by numerous drug screens and a hair follicle test. In light of that evidence, she argued, the trial court erred in finding that clear and convincing evidence established that J. G. was deprived.

The juvenile court found J. G. deprived for five reasons: (1) emotional abuse; (2) lack of adequate supervision; (3) inadequate housing; (4) the mother's mental impairment; and (5) failure to provide adequate support. While evidence in the record establishes that the mother has worked hard to fulfill the goals set for her — remaining drug free, attending counseling, cleaning and organizing her house, and budgeting her income — clear and convincing evidence supports the court's finding that J. G. has suffered from emotional abuse caused by his mother's mental impairment and is deprived.

That evidence includes testimony by the juvenile court investigator that J. G. said he did not want to go live with his mother. When asked why, he said because she did not have certain games, but his grandmother testified that the games he mentioned had been put away for two months and that he could take anything he wanted with him to his mother's house. J. G. did not like visiting with his mother either, but could not or would not say why. He was always anxious and "hyper" while the investigator was present. During supervised visitation with his mother in October 2009, J. G. would not talk to her or remain in the room, but ran out into the hall to find his grandmother. During a second visitation at DFCS, J. G. would not engage with his mother, despite her efforts, but kicked her, banged on the door, and ran out of the room twice. He "shuts down" during visits with her, the investigator observed. The investigator had to try repeatedly to schedule home visits with the mother, who was too busy to meet and could not understand why people kept going in and out of her house when J. G. was not there.

When asked if she thought the mother was taking her medica-

tion, the investigator replied that she did not know, but that the mother's behavior had changed. At first she was cooperative, but then she was always too busy or too tired to meet. The mother told her doctor that she was homeless and slept in her uncle's shed, but could not explain why she told him that when it was not true. She was opposed to family counseling, because she thought her family got along fine. When the investigator asked for proof of income or copies of bills, the mother replied that the investigator could get all of that information from DFCS and her attorney, and during their last conversation, the mother did not make sense and could not stay on point. The investigator recommended that J. G. stay with his grandmother until he was 18 because as long as he lacked stability, he would remain insecure. He felt safe with his grandmother, and experienced a lot of anxiety over whether he was staying with her or going to live with his mother.

The grandmother testified that she obtained temporary custody of J. G. when his mother was on drugs, and that he had many memories of coming and going between the mother and grand-mother, which was hard for him. Mother and son loved each other, but the mother had changed recently, the grandmother observed, perhaps because she was not taking her medication properly. For example, during church services in October 2009, the mother made a scene. She began moving from place to place inside the sanctuary, then took J. G.'s arm and urged him to leave with her. The grandmother took J. G. outside and the mother began pulling on J. G.'s arm while shouting that he was her child. A church member testified that she saw the incident begin inside the church and followed the family outside, because when these things happened "usually [J. G.] gets upset" and does not know what to do, so "[u]sually we try to get them outside so it would not be a disturbance to the other church members." When the member saw them outside, J. G. was clinging to his grandmother with one arm, crying and confused, while his mother pulled on his other arm. The church member walked J. G. around the corner to console him and dry his tears, then his grandfather put him in the car and took him home. The member said the mother was a nice woman, sometimes quiet and lovable but sometimes not, and thought she was acting abnor-mally that day.

The grandmother also recounted that before Thanksgiving in 2009, a teacher from J. G.'s school told his mother not to return to the school because she was disrupting class, and over Thanksgiving the mother and her sister got into a physical fight in the grandmoth-er's living room. While J. G. was not present during the altercation, he came down after his grandfather had separated the siblings and saw his aunt crying and his mother told to leave the house. The

grandmother testified, "[The mother] thinks I want her child and God knows I don't want her child. I'm 59 years old. I don't need another child. All I want is for her to be well . . . and take her medication." J. G. and his mother play like children, and he loves her, the grandmother testified, but he did not want to be around her when she was off her medication. J. G. would "holler and scream like a two-year-old" rather than leave his grandmother's house to visit his mother, and would not stay at his mother's house for even an hour the day before the hearing. When the mother did not take her medication, she became confused and her mannerisms were different, the grandmother said.

The mother testified that she had merely tried to hug J. G. at church, and that the witnesses who testified otherwise had been coached by J. G.'s grandmother. She explained that her son said he did not want to live with her because he did not want to hurt his grandmother's feelings and she admitted that it upset J. G. when he witnessed disputes between his mother and grandmother. The mother testified that the grandmother, her mother, ordered her around as if she were a child, and she was "fed up with it." She had come to court twenty times, and volunteered that she was angry with her mother because she let her begin drinking alcohol when she was five years old.

The juvenile court noted that during the second day of the deprivation hearings, the mother was rocking back and forth in her chair, making quick, jerking eye and head movements and talking to herself. While the mother disputed other witnesses' testimony that she had not provided documentation of income and expenditures as requested, the court found the mother was not credible and that her testimony was inconsistent. The mother minimized the events at church and school described above and testified that J. G. was not harmed by them. She also denied being off of her medication, but the court found that her demeanor on the stand and her inconsistent testimony indicated her dishonesty. In sum, the juvenile court found that

> the mother's testimony was illustrative of her continued inability to protect her child and to view occurrences only from her own perspective. She exhibited behavior indicative of her inability to consider what is best for her child, and was extremely self-serving. She appeared to this Court to be unaware of the distress that she continues to cause her own child, and was quick to blame others for her inability to maintain a safe and stable home for [J. G.].

The juvenile court's role is to weigh the evidence, and this

court's role is to determine whether any rational trier of fact could have found clear and convincing evidence of deprivation. *In the Interest of A. B.*, 285 Ga. App. at 288; *In the Interest of J. B.*, 274 Ga. App. 564, 568 (618 SE2d 187) (2005). In deciding whether a child is without proper parental care or control, a finding of deprivation is authorized if evidence establishes that the parent has been diagnosed with a mental illness, and that the parent's behavior and symptoms as a result of the illness reflect that she cannot adequately and safely care for the child. See OCGA § 15-11-94 (b) (4) (B) (i); *In the Interest of E. G.*, 284 Ga. App. 524, 528-529 (1) (b) (644 SE2d 339) (2007); *In the Interest of D. A. B.*, 281 Ga. App. 702, 703-704 (1) (b) (637 SE2d 102) (2006).

Despite evidence that the mother fulfilled many of the goals set for her by the court, sufficient evidence supports the court's finding that, as a result of her mental illness, the mother cannot adequately care for J. G., even if her unfitness is unintentional. Construed in the light most favorable to the juvenile court's finding of deprivation, sufficient evidence supports the juvenile court's conclusion that J. G. was deprived as to the mother.

2. The mother asserts that the juvenile court erred in giving custody of J. G. to DFCS, arguing that her mental impairment does not render her unable to parent him. The three incidents cited by the juvenile court as illustrations that the mother's conduct emotionally disturbed the child were of limited relevance, she argues, because they occurred while the mother did not have physical custody. While some evidence in the record supports the conclusion that J. G. was not disturbed by these incidents, other evidence showed that J. G. was very distressed by disputes between his mother and grandmother. The evaluating psychologist confirmed the mother was bipolar with a schizoaffective disorder, was highly suspicious, bitter, and hostile, and was hypersensitive and unforgiving. She reported a chronic feeling of being unloved, and it appeared that she had J. G. to satisfy her need to be loved. The psychologist characterized this mother-child relationship as "inappropriate," noting the mother's statement that child-proofing her house for a six-year-old was "stupid."

Given all of this evidence, the juvenile court was entitled to infer that J. G. would not be safe in his mother's custody and that she could not properly care for him at the time of the deprivation hearing. Thus, the juvenile court did not err in removing legal custody of J. G. from his mother. See *In the Interest of S. D. H.*, 287 Ga. App. 684, 689 (652 SE2d 570) (2007).

*Judgment affirmed. Blackwell and Dillard, JJ., concur.*

DECIDED MARCH 1, 2011.

*Richard C. Metz*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Beckmann & Lewis, Leo G. Beckmann, Jr., Taylor, Odachowski, Schmidt & Crossland, Carrie Murray Nellis*, for appellee.